**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
EASTERN DIVISION**

Brian K. Parsons,                                    :          Case No. 1:09 CV 0102

      Plaintiff,                                 :

         vs.                                     :

Commissioner of Social Security,            :          **MAGISTRATE'S REPORT AND
                                                                    RECOMMENDATION**

      Defendant.                               :

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final

determination denying his claim for Disability Insurance Benefits (DIB) under Title II of the Social

Security Act (Act).  Pending are the parties' Briefs on the Merits (Docket Nos. 26 and 27).  For the

reasons set forth below, the Magistrate recommends that the Court affirm the Commissioner's decision.

.                                          **I. PROCEDURAL BACKGROUND**

On September 13, 2004, Plaintiff filed an application for DIB, alleging that he had been disabled

since March 14, 2003 (Tr. 64-66).   The application for DIB was denied initially and upon

reconsideration (Tr. 48-50, 43-45).  A hearing was conducted on March 27, 2007, before Administrative

Law Judge (ALJ) Thomas A. Ciccolini.  Plaintiff, represented by counsel and Vocational Expert (VE)

Mark A. Anderson appeared and testified (Tr. 372).  On April 11, 2007, the ALJ concluded that Plaintiff

was not under a disability as defined under the Act (Tr. 16-28).  The ALJ's decision became the final decision of the agency when the Appeals Council denied review on November 6, 2008 (Tr. 4-6).

Plaintiff was granted leave to file his Complaint which was proffered three days after the expiration of the time to file a request for judicial review (Docket No. 19).  On February 16, 2011, Plaintiff was ordered to file his brief within 45 days and Defendant's brief was due 45 days thereafter.  Without leave of Court, Plaintiff filed a "First Brief in Support of Plaintiff's Position" three weeks after the brief was scheduled for filing (Docket Nos. 25 and 26).  Subsequently, Defendant filed its brief (Docket No. 27).

## II.  FACTUAL BACKGROUND.

### A.    PLAINTIFF'S TESTIMONY

At the ALJ hearing, Plaintiff testified that he was 37 years of age and had completed the ninth grade.  He was recently married and his spouse was employed (Tr. 393, 407).  In 1991, Plaintiff injured his right hand in a work-related accident.  His hand became caught in a screw machine and the drill ran through his hand.  Following the accident, Plaintiff was diagnosed with reflex sympathetic dystrophy, a clinical syndrome of variable course and unknown cause characterized by pain, swelling and vasomotor dysfunction of an extremity, in his right arm and hand (Tr. 380; emedicine.medscape.com).

Plaintiff was plagued by persistent swelling, pain and lack of sensation.  The pain and swelling interfered with his ability to grasp and manipulate.  Several treatments such as surgery, paraffin treatment, physical therapy, home therapy and a muscle stimulator had been employed.  None successfully addressed his hand and arm problems (Tr. 379-380, 381).  Despite his limitations, Plaintiff continued to work until 2003 when he began receiving workers' compensation benefits (Tr. 379, 382, 394, 396, 407).

2

Plaintiff worked as a locksmith for three or four months until September, 1993 (Tr. 381-382). He was employed for approximately six years as a machine operator (Tr. 382). In that capacity, he was required to read blueprints and technical manuals to the extent that he had to examine parts. Minimal mathematical calculations were employed to complete the job (Tr. 385).

Plaintiff was employed also for six years as a tool grinder/machinist (Tr. 382). Plaintiff was required to read short blueprints and respond to written instructions. When using the grinder, he was required to make decisions that involved basic mathematics. Significant standing, bending, stooping and crouching were involved. Plaintiff lifted up to 100 pounds occasionally and up to fifty pounds routinely (Tr. 383, 384).

Plaintiff estimated that he could not walk for fifteen minutes without resting and he could not sit more than forty minutes without standing or stretching (Tr. 386).

Plaintiff had undergone mental health treatment for the past two to three years. The psychiatrist had prescribed a medication regimen to control anxiety attacks and relieve nerve pain (Tr. 387). The medication was actually effective, assisting him to cope with frustration and his desire to conceal himself from his family. There were minimal side effects, namely, irregular bowel movements and nervousness (Tr. 388, 389).

Plaintiff admitted that he had difficulty focusing and remaining on task (Tr. 389-390). However, he also admitted that he spent an inordinate amount of time focusing on pain. The onset of pain and swelling interfered with his ability to sleep (Tr. 391) and he had difficulty reading and writing (Tr. 393).

## B.  THE VE'S TESTIMONY

The VE classified Plaintiff's past relevant work as a delivery driver as defined at 230.663-010 of the Dictionary of Occupational Titles (DOT). This unskilled job required a light level of exertion.

3

The tool grinder position, described at 603.664.010 of the DOT, was a semiskilled job requiring a medium level of exertion and a level of preparation from thirty one days to three months.  The screw machine operator position, described at 604.685-034 of DOT, was a medium level, semiskilled job with a level of preparation from thirty one days to three months (Tr. 395, www.occupationalinfo.org.)

    **1.        HYPOTHETICAL QUESTION NUMBER ONE:**

The VE considered a hypothetical worker of Plaintiff's age, educational background and level of employment, who could:

- Lift, carry, push or pull up to twenty pounds frequently,
- Sit two thirds of an eight-hour workday;
- Stand two-thirds of an eight-hour workday;
- Walk two-thirds of an eight-hour workday;
- Avoid hazards;
- Refrain from fine manipulation;
- Refrain from reaching over shoulder level;
- Engage in low stress work with no production quotas;
- Refrain from complex, high production pace employments.

(Tr. 397-398).

The VE responded that his conclusions were based on data derived from the National Employment Statistics, the Census Code and the Bureau of Labor Statistics (Tr. 396).  The VE acknowledged that none of these standards included a sit/stand option; however, he was familiar with jobs that would accommodate a sit/stand option.  In this case, there were a number of jobs that would accommodate the hypothetical worker:

| JOB | DOT NUMBER | NATIONAL AVAILABILITY |
|-----|-----------|----------------------|
| Courier | 230.663-010 | 138,000 |

| Finish Inspector | 741.687-010 | 125,000 |
| Housekeeping | 323.687-014 | 806,000 |

### 2. HYPOTHETICAL QUESTION NUMBER TWO:

Plaintiff's counsel extended the hypothetical to the limitations expressed by Dr. Marshall, including but not limited to:

- Lifting/carrying fifteen pounds, five pounds occasionally and two pounds frequently;
- Standing/walking for one hour in an eight-hour workday, sit for two hours in an eight-hour workday;
- Never climbing or crawling;
- Refraining from reaching, handling, feeling and pushing/pulling;
- Avoiding moving machinery, temperature extremes, humidity and vibration;
- Sitting two hours out of eight, one hour at a time;
- Stooping, crouching and kneeling occasionally;
- Reaching, handling, pushing and pulling on a limited basis;
- Avoiding temperature extremes;
- Extending fingers with difficulty;
- Decreased sensation in the dorsum or the right hand;
- Reduced grip strength; and
- Less than full range of motion in the fingers.

The VE opined that with the restrictions of one extremity, the hypothetical plaintiff could perform:

| JOB | DOT NUMBER | NATIONAL AVAILABILITY |
| --- | --- | --- |
| Sample carrier | 9.22.687-054 | 125,000 |

(Tr. 401-404).

### 3. HYPOTHETICAL NUMBER THREE.

5

Plaintiff's counsel added that the hypothetical plaintiff had:

- ▸ Moderate limitations in concentration and attention for extended periods of time;
- ▸ Moderate limitations in completing a normal work week without psychiatric or psychological symptoms;
- ▸ Moderate limitations in the ability to interact appropriately with the general public, co-workers, take instructions and criticism from supervisors;
- ▸ Moderate limitations in the ability to respond to changes in the work setting;
- ▸ A reading level of 4.5 and no computer skills;
- ▸ A limited ability to write legibly with either hand; and
- ▸ A limited ability to concentrate.

(Tr. 404-405).

The VE explained that the hypothetical plaintiff could perform work as a courier, inspector and/or house cleaner (Tr. 406).

### III. MEDICAL EVIDENCE.

In 1991, Plaintiff's right hand was caught in a stationary drill and he sustained a "crush type" injury and laceration (Tr. 156, 301).  Subsequently, Plaintiff injured his back when lifting weights (Tr. 156).

Plaintiff underwent surgery on his hand during which his metacarpals were set and wrapped. Three years after the injury to his hand, he began to experience numbness and pain (Tr. 156).  On July 26, 1994, a magnetic resonance imaging (MRI) of Plaintiff's right hand presumed post traumatic and post surgical thickening of the exterior slips of the middle and index fingers; however, the carpal tunnel was normal (Tr. 239).

On March 2, 2005, Plaintiff was examined by Dr. Thomas N. Markham, M.D., an occupational medicine physician, who addressed the conditions of an open wound on the right hand, ankylosis of the

right hand and adjustment reactions (Tr. 301).  It was his opinion that Plaintiff exhibited clinical symptoms and signs consistent with right carpal tunnel syndrome even though the diagnostic studies did not confirm this diagnosis (Tr. 305).  Dr. Markham further opined that Plaintiff had reached maximum medical improvement for the allowed physical condition on his claim for worker compensation and no further treatment was necessary (Tr. 305).

The results from the MRI of Plaintiff's hand administered on June 25, 2003, showed no evidence of soft tissue mass, muscle damage or tears.  The MRI administered on July 17, 2003, of Plaintiff's hand, showed no change in tissue mass, muscle damage or sign of muscle laceration (Tr. 242, 243).  On August 28, 2003, Plaintiff's right hand tested negative for the presence of irritated nerves or carpal tunnel syndrome (Tr. 240).

Dr. R. Dion Fernando, M.D., conducted nerve tests on September 11, 2003.  The results from the study were essentially normal, showing no definite evidence of neuropathy or entrapment syndrome and no evidence of radial nerve injury (Tr. 119).

On October 16, 2003, Plaintiff was examined by Carrie L. Goode, M. Ed., a vocational consultant Ms. Goode administered a number of clinical and diagnostic tests including the Wide Range Achievement Test, the Nelson-Denny Reading Test, the Differential Aptitude Test and a "self-directed search" (Tr. 144).  The results from the Wide Range Achievement Test placed Plaintiff in the end of the 6th grade with respect to math abilities and vocabulary skills (Tr. 145).  Plaintiff performed within an average range on the aptitude test as little reading was involved.  The self-directed search simply measured Plaintiff's interests.  Plaintiff's interests were realistic, investigative and enterprising in nature

7

(Tr. 146).

A clinical interview was conducted on November 13, 2003, by Dr. James M. Meddling, Ph. D., a clinical psychologist.  Diagnostically, Plaintiff presented with an adjustment disorder with mixed anxiety and a depressed mood.  Plaintiff's complaints of an adjustment disorder were the direct and proximate result of a work accident that occurred in December 1991 (Tr. 122).  Plaintiff underwent occupational rehabilitation therapy for four weeks.  At the conclusion of the sessions, Plaintiff's reported increased pain in the right hand with work activities (Tr. 129-136).

While undergoing physical rehabilitation, Plaintiff injured his thoracic region.  On November 12, 2003, Dr. Thomas E. Mandat, M. D., internist, treated Plaintiff for a thoracic spine strain (Tr. 198).  On the following day, Dr. Mandat treated Plaintiff for a right-hand fracture (Tr. 197).  In December 2003, Dr. Mandat conducted a follow-up examination of the thoracic spine strain and hand fracture (Tr. 194, 196).  During the follow-up care conducted in March 23, 2004, Dr. Mandat recommended that Plaintiff renew work hardening and work conditioning exercises (Tr. 192).  To assist with the inflammation and pain, Dr. Mandat injected Plaintiff's right hip with an anti-inflammatory medication (Tr. 187).

Dr. James H. Fry, a psychiatrist, treated Plaintiff on four separate occasions in August, September and October 2004 (Tr. 155).  When Dr. Fry retired, Dr. Francis L. McCafferty, a psychiatrist assumed responsibility for Plaintiff's care.  From June 24, 2005, through July 24, 2006, Dr. McCafferty monitored Plaintiff's consumption of antidepressants.  At one point, Plaintiff stopped all medication as he was suffering from sleep deprivation and hallucinating.  Different medications were given on a trial

8

basis.  Ultimately Dr. McCafferty treated Plaintiff with Prozac and supportive psychotherapy during which he addressed, *inter alia*, issues of anger, frustration and fear (Tr. 244-271, 347-362).

Dr. Mehdi Saghafi, M. D., diagnosed Plaintiff with residual low back strain on November 19, 2004 (Tr. 157).  Plaintiff could raise his cervical spine, shoulders, elbows, wrists, hips, ankles and hands/fingers against maximal resistance.  Plaintiff's range of motion in the dorsolumbar spine and knees was impaired (Tr. 158-161).

Dr. Bruce J. Goldsmith, Ph. D., opined on November 29, 2004, that Plaintiff had an adjustment disorder with anxiety and depression (Tr. 165).  He found the following degree of functional limitations:

| | | |
|---|---|---|
| 1. | Restriction on activities of daily living | Mild |
| 2. | Difficulties in maintaining social functioning | Moderate |
| 3. | Difficulties in maintaining concentration, persistence or pace | Moderate |
| 4. | Episodes of decompensation each of extended duration | None |

(Tr. 172).

Plaintiff had moderate limitations in the following abilities to:

1.  Maintain attention and concentration for extended periods;
2.  Complete a normal workweek and work day without interruptions;
3.  Interact appropriately with the general public;
3.  Accept instructions and respond appropriately; and
4.  Respond appropriately to changes in the work setting.

(Tr. 176-177).

On April 11, 2005, Jerry Liepack determined that Plaintiff had no visual, communicative or environmental limitations; however, Plaintiff could:

1.  Occasionally lift and/or carry twenty pounds;
2.  Frequently lift and/or carry ten pounds;

9

3    Stand and/or walk for about six hours in an eight-hour workday;
4.    Sit for a total of about six hours in an eight-hour workday;
5.    Push and/or pull limited in the upper extremities;
6.    Never climb using a ladder/rope/scaffolds;
7.    Never crawl; and
8.    Reach in all directions, handle, finger, and feel limited due to pain and weakness.

(Tr. 200-202).

Plaintiff sustained injuries to his right shoulder, back, neck and left hip pain on June 26, 2005 (Tr. 216, 218).  X-rays of the cervical, thoracic and lumbar spine, shoulder and left hip showed no bone or joint abnormality (Tr. 224, 225, 226, 227, 228).  Nevertheless, Plaintiff was given a sling to rest his arm. Plaintiff was denied a new drug for pain as he tested positive for illicit drug usage (Tr. 219, 221).

On August 16, 2005, Dr. Cynthia Taylor, Doctor of Osteopathic Medicine, opined that the medical evidence submitted supported the existence of a reflex sympathetic dystrophy of the right upper extremity (Tr. 238).

Dr. Bruce A. Guberman, M. D., a cardiologist, conducted an examination on May 9, 2006 and confirmed the diagnosis of post traumatic reflex sympathetic dystrophy (Tr. 280).  Dr. Guberman believed that Plaintiff had reached maximum medical improvement in regard to the injury of December 7, 1991 (Tr. 281).

Dr. Cyril E. Marshall, M.D., assumed Plaintiff's care on or about April 24, 2006 (Tr. 290).  He disagreed with Dr. Guberman, opining on August 31, 2006, that Plaintiff had not reached maximum medical improvement as all treatment options had not been explored (Tr. 283).  Specifically, Dr. Marshall noted that other than a one time stellate ganglion block, no aggressive treatment plan had been

10

developed (Tr. 283).  Dr. Marshall monitored Plaintiff's use of medication, sleep disturbances, violent

thoughts, feelings of hopelessness, worthlessness and profuse sweating (Tr. 282-289, 311, 312, 317, 318-

333).  Pursuant to Dr. Marshall's recommendation, Plaintiff underwent a neurological evaluation for

physical therapy on May 22, 2006 (Tr. 291-293, 295).  On February 20, 2007, Dr. Marshall assessed and

summarized how Plaintiff's physical capabilities were affected by his impairment:

> (1) The presence of reflex sympathetic dystrophy affected Plaintiff's ability to lift/carry a maximum of fifteen pounds, five pounds occasionally and two pounds frequently;
>
> (2) The presence of thoracic and lumbosacral conditions affected weight bearing capabilities; consequently, Plaintiff could stand/walk no more than one hour in an eight-hour workday;
>
> (3) Chronic spasms created an intolerance for prolonged positioning; consequently, Plaintiff could not sit longer than two hours in an eight-hour workday.
>
> (4) A severe upper right extremity precluded climbing and crawling.
>
> (5) The presence of reflex sympathetic dystrophy with decreased sensation and vasomotor changes weaknesses and pain affected Plaintiff's ability to reach, handle, feel and push/pull.
>
> (6) Plaintiff had an extreme sensitivity to temperature changes, moving machinery, humidity and vibration.

(Tr. 344-345).

On February 7, 2007, Plaintiff underwent emergency room treatment for distal phalanx fractures.

The injuries were repaired (Tr. 363-371).

### IV. STANDARD FOR ESTABLISHING DISABILITY.

To be entitled to disability insurance benefits, an individual must be under a disability within the

meaning of the Act.  *Rabbers v. Commissioner Social Security Administration*, 582 F.3d 647, 651 -652

(6th Cir. 2009) (*citing* 42 U.S.C. § 423(a)(1)(E)).  The Act defines "disability" as the "inability to engage

in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U. S. C. § 423(d)(1)(A)).  The individual also must be insured for disability insurance benefits, have not attained retirement age, and have filed an application for benefits.  *Id.* at 652 fn. 5 (*citing* 42 U.S.C. § 423(a)(1)).

The Social Security Administration (SSA) has established a five-step sequential evaluation process for determining whether an individual is disabled.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)).  If the claimant is found to be conclusively disabled or not disabled at any step, the inquiry ends at that step. *Id.*  The five steps are as follows:

(1)     If the claimant is doing substantial gainful activity, the claimant is not disabled.

(2)     If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities, the claimant is not disabled.

(3)     If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

(4)     If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

(5)     If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Id.* (*citing* 20 C. F. R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g); *see also Cruse v. Commissioner of Social Security,* 502 F.3d 532, 539 (6th Cir. 2007); *Walters v. Commissioner of Social Security,* 127 F.3d 525, 529 (6th Cir. 1997)).  The claimant bears the burden of proof through step four; at step five, the burden shifts to the Commissioner.  *Id*. (*citing Jones v. Commissioner of Social Security,* 336 F.3d

12

469, 474 (6th Cir. 2003)).

## V.  THE ALJ'S FINDINGS

The ALJ applied the governing five step analyses and determined that Plaintiff was not disabled. At step one, the ALJ found that Plaintiff met the insured status requirements of the Act through June 20, 2008, and Plaintiff had not engaged in substantial gainful activity since March 14, 2003, the alleged onset date of disability.

At step two, the ALJ found that Plaintiff had the following severe impairments:  reflex sympathetic dystrophy and adjusted disorder with mixed anxiety and depressed mood.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1525 and 404.1526).  Plaintiff did, however, have the residual functional capacity to perform the exertional requirements of basic work related activities except for lifting, carrying, pushing and pulling more than twenty pounds frequently; standing more than 2/3 of an eight-hour workday, walking more than 2/3 of an eight-hour workday, sitting more than 2/3 of an eight-hour workday, working around hazards, fine manipulation with the fingers, wrist or arm, frequent extension/reaching above shoulder level and more than low stress.

At step four, the ALJ found that Plaintiff was incapable of performing his past relevant work.

At step five, the ALJ found that Plaintiff, a younger individual with a limited education and the ability to communicate in English, was capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  Based upon his step five finding, the ALJ

13

concluded that Plaintiff was not under a disability, as defined in the Act, at any time from March 14, 2003, the alleged onset date, through April 11, 2007, the date of the decision (Tr. 16-28).

## VI. STANDARD OF REVIEW.

When reviewing the Commissioner's determination of whether an individual is disabled pursuant to 42 U.S.C. § 405(g), the Court is limited to determining "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Johnson v. Astrue,* 2010 WL 5559542, *3 (N. D. Ohio 2010) (*citing Blakley v. Commissioner of Social Security*, 581 F.3d 399, 405 (6ᵗʰ Cir. 2009) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6ᵗʰ Cir. 1997)). The reviewing court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility. *Id.* (*citing Walters*, *supra*, 127 F.3d at 528).

If the ALJ applied the correct legal standards and his or her findings are supported by substantial evidence in the record, his or her decision is conclusive and must be affirmed. *Id.* (*citing Warner v. Commissioner of Social Security*, 375 F.3d 387, 390 (6ᵗʰ Cir. 2004); 42 U.S.C. § 405(g)). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6ᵗʰ Cir. 2007); *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971) (*citing Consolidated Edison v. NLRB*, 59 S. Ct. 206, 217 (1938)). The substantial evidence standard is intended to create a "zone of choice within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 773 (6ᵗʰ Cir. 2001) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6ᵗʰ Cir. 1986)). Therefore, it is immaterial whether the

14

record may also possess substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have decided the case differently. *Id.* (*citing Crisp v. Secretary of Health & Human Services,* 790 F.2d 450, 453 n. 4 (6th Cir. 1986)).

In addition to reviewing the ALJ's findings to determine whether they were supported by substantial evidence, the Court also reviews the ALJ's decision to determine whether it was reached through application of the correct legal standards and in accordance with the procedure mandated by the regulations and rulings promulgated by the Commissioner. *Id.* (*see Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) ("Although substantial evidence otherwise supports the decision of the Commissioner in this case, reversal is required because the agency failed to follow its own procedural regulation, and the regulation was intended to protect applicants like [plaintiff]."); *Id.* at 546 ("The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action . . . found to be . . . without observance of procedure required by law.' ") (*quoting* 5 U.S.C. § 706(2)(d) (2001)); *cf. Rogers*, 486 F.3d at 243 (holding that an ALJ's failure to follow a regulatory procedural requirement actually "denotes a lack of substantial evidence, even when the conclusion of the ALJ may be justified based upon the record").

"It is an elemental principal of administrative law that agencies are bound to follow their own regulations," *Id.* (*citing Wilson*, *supra*, 378 F.3d at 545, and the Court therefore "cannot excuse the denial of a mandatory procedural protection . . . simply because there is sufficient evidence in the record" to support the Commissioner's ultimate disability determination. *Id.* (*citing Wilson*, *supra*, 378 F. 3d at 546).   The Court may, however, decline to reverse and remand the Commissioner's determination if it finds that the ALJ's procedural errors were harmless. *Id.* (*see Shinseki v. Sanders*,

15

129 S. Ct. 1696, 1706 (2009) (finding that a party seeking to overturn an agency's administrative decision normally bears the burden of showing that an error was harmful)).

An ALJ's violation of the SSA's procedural rules is harmless and "will not result in reversible error absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the [ALJ]'s procedural lapses." *Id.* at *4 (*citing Wilson*, *supra*, 378 F.3d at 546-47 (emphasis added) (*quoting Connor v. United States Civil Services Commissioner*, 721 F.2d 1054, 1056 (6th Cir. 1983)). Thus, an ALJ's procedural error is harmless if his or her ultimate decision is supported by substantial evidence and the error did not deprive the claimant of an important benefit or safeguard. *Id.* (*see Wilson, supra*, 378 F. 3d at 547 (holding that an ALJ's violation of the rules for evaluating the opinion of a treating medical source outlined in 20 C.F.R. § 404.1527(d) was a deprivation of an "important procedural safeguard" and therefore not a harmless error). If a procedural error is not harmless, then it warrants reversing and remanding the Commissioner's disability determination. *Id.* (*citing Blakley*, *supra*, 581 F.3d at 409) (stating that a procedural error, notwithstanding the existence of substantial evidence to support the ALJ's ultimate decision, requires that a reviewing court "reverse and remand unless the error is a harmless de minimis procedural violation").

## VII. PLAINTIFF'S POSITION.

Plaintiff asserts that the ALJ committed reversible error by failing to:

(1)     Find Dr. Marshall's opinions reliable;
(2)     Evaluate Plaintiff's complaints and other symptoms pursuant to SSR 96-7p; and
(3)     Give good reasons for not attributing controlling weight to Dr. Marshall's opinions.

## VIII. ANALYSIS.

16

### A.    RESIDUAL FUNCTIONAL CAPACITY.

Plaintiff's first argument is that Dr. Marshall diagnosed Plaintiff with reflex sympathetic dystrophy.  He determined that Plaintiff had physical limitations caused by reflex sympathetic dystrophy.  In effect, Plaintiff is arguing that it was reversible error for the ALJ not to rely on Dr. Marshall's lifting, carrying, reaching, handling, feeling and pushing and pulling limitations caused by this condition in assessing residual function.

A claimant's residual functional capacity includes all of her or his physical, mental, and other limitations.  20 C.F.R. §§ 404.1545(a)(4), (b)-(d) (Thomson Reuters 2011).  A claimant's residual functional capacity is what she or he can still do despite physical, mental, nonexertional, and other limitations.  20 C. F. R. § 404.1545(a)(2) (Thomson Reuters 2011).  The responsibility for determining a claimant's residual functional capacity resides with the ALJ.  *Fleischer v. Astrue*, 2011 WL 797336, *5 (N. D. Ohio 2011) (*see* 20 C.F.R. §§ 404.1546(c), 416 .946; *Potter v. Astrue*, 2010 U.S. Dist. LEXIS 66748, *28–*29 (S.D. Ohio June 2, 2010) (*citing Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963)).

In rendering a decision about residual functional capacity, the ALJ must give some indication of the evidence upon which he or she is relying, and he or he may not ignore evidence that does not support his or her decision, especially when that evidence, if accepted, would change his or her analysis. *Id.* (*see Bryan v. Commissioner of Social* Security, 383 Fed. Appx. 140, 148 (3rd Cir. 2010) (*quoting Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3rd Cir. 2000) ("The ALJ has an obligation to 'consider **all** evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [ ... ] contradictory, objective medical evidence' presented to him."); *Id.* (*citing Baltazar v. Astrue*, 2011 U.S. Dist. LEXIS 4641, *22 (W. D. Ark. Jan. 18, 2011) (*citing Pate–Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009); 20 C.F.R. §§ 404.1527(f)(2),

416.927(f)(2); SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).

In this case, Dr. Marshall explained that Plaintiff had the residual functional capacity to lift and/or carry up to fifteen pounds but he could not use his hands to grip, grasp, climb, crawl, reach, handle, feel push/pull or move machinery (Tr. 344, 345). The ALJ considered Dr. Marshall's opinions that Plaintiff had a significant reduction in residual functional capacity because of the symptoms of reflex sympathetic dystrophy. Accordingly, the ALJ articulated good reasons for the weight assigned and properly assigned weight to the opinions in assessing residual functional capacity for Plaintiff's hands (Tr. 24). The ALJ adopted Dr. Marshall's exertional requirements in limiting Plaintiff's ability to lift, carry, push, pull, work around hazards, manipulate with his fingers and reach overhead. The ALJ found, however, that Dr. Marshall's opinion conflicted with the EMG, MRI and x-ray findings regarding Plaintiff's back and right hand as well as the opinions of Drs. Saghafi and Guberman. The ALJ concluded that no clinical notes or other objective medical evidence of a severe impairment to the hand support the limitations of Plaintiff's ability to grip, grasp, climb, crawl, reach, handle, feel push/pull or move machinery as suggested by Dr. Marshall. Specifically, there is no evidence of neuropathy, entrapment syndrome, tissue deformity, muscle damage, irritated or injured nerves or carpal tunnel syndrome that would result in these extreme limitations (Tr. 242, 243). On August 28, 2003, Plaintiff's right hand tested negative for the presence of irritated nerves or carpal tunnel syndrome (Tr. 119, 240, 242, 243).

In rendering this decision, the ALJ discussed the evidence upon which he relied. He did not ignore evidence that did not support his decision. He did discount the conclusions drawn by Dr.

18

Marshall for which there was no objective medical basis.

**B.     SSR 96-7P.**

Plaintiff argues that the ALJ erred by failing to evaluate his complaints and other symptoms in accordance with SSR 96-7p, POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186 (1996).

The purpose of SSR 96-7p is to clarify when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of a claimant's statements about pain, other symptoms and functional effects.  Additionally, the ruling assists in explaining the factors to be considered in assessing the credibility of the individual's statements about symptoms and the importance of giving reasons for credibility findings of the claimant's statements in the disability determination or decision.

The Magistrate finds that the ALJ stated specifically that he conducted this examination of symptoms using the requirements of SSR 96-7p.  In addition, the ALJ conducted an analysis consistent with SSR 96-7 to assess Plaintiff's credibility about his symptoms and their effects. (Tr. 20).  This decision is conclusive and must be affirmed.

**C. CONTROLLING WEIGHT**

Plaintiff argues that the ALJ erred by failing to give Dr. Marshall's opinions the weight required by 20 C. F. R. § 404.1527(d)(2).

Under 20 C. F. R. § 404.1527(d)(2), the following guidelines are set forth for evaluating opinion evidence:

(d)  How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this

19

section, we consider all of the following factors in deciding the weight we give to any medical opinion.

> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. **When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) (length of the treatment relationship) and (d)(2)(ii) (nature and extent of the treatment relationship) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) (supportability, consistency, specialization and other factors) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion (emphasis added).**

The ALJ failed to give controlling weight to the opinion of Dr. Marshall in its entirety. At pages 24 and 25 of the transcript, the ALJ explained that Dr. Marshall specialized in the treatment of Plaintiff's hands; the treating relationship spanned at least two years; the nature and extent of the relationship was limited to the right-hand condition; and Dr. Marshall's opinions were inconsistent with some of the diagnostic evidence or opinions of state agency consultants. Hence, the ALJ conducted the analysis of Dr. Marshall's opinions consistent with the requirements of 20 C. F. R. § 404.1527(d)(2) and explained why and to what extent he discounted Dr. Marshall's opinions. The ALJ applied the correct legal standard and his decision is supported by substantial evidence in the record. Accordingly, the Magistrate recommends that the Commissioner's decision with respect to treatment of Dr. Marshall's opinions be affirmed.

## IX. CONCLUSION.

Based on the foregoing analysis, the Magistrate recommends that the Court affirm the

Commissioner's decision and terminate the referral to the undersigned Magistrate.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   June 24, 2011


## X.  NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Also, please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.